Lewis Bograd v. Appellant Shirley Brinkley Thank you, Your Honor, and may it please the Court, Lewis Bograd v. Appellant Shirley Brinkley. This appeal requires this Court to decide an issue left open in its two prior rulings in this factual context, Bell v. Fullington, whether federal law preempts a state law failure to warn claim based on a generic drug company's failure to provide a warning that the FDA had already approved. Long-term use of the prescription drug metoclopramide poses an In July 2004, the FDA ordered the addition of a boldface warning to the metoclopramide label. Therapy should not exceed 12 weeks in duration. But Appellee Pliva never added this warning to its metoclopramide label, and no one told Shirley Brinkley nor her doctor about this new warning against long-term use. Did her doctor find out about it by any other means? No, he did not, Your Honor. And that's a factual dispute that is raised in the briefs, but I think if you read the allegations in the complaint, the allegations in the complaint very explicitly say that no manufacturer of metoclopramide, including Pliva and the manufacturer of the brand product, Schwartz, did anything to effectively or reasonably communicate, publish, disseminate, or otherwise bring the 2004 FDA label change to the attention of the medical community or even send a copy of the new label to plaintiffs prescribing physician. The doctor prescribed Reglan and said he relied on, he or she relied on Reglan information. Why isn't there, why doesn't that break any causation? Well, Your Honor, this If Pliva would have put it, in other words, if Pliva would have put it in, Larry wouldn't have looked at it anyway. Well, Your Honor, I think you're, there's a, it's important to remember that this is, the issue here is failure to warn. The question is whether Pliva adequately warned the physician. Pliva did not adequately warn the physician. Had Pliva adequately warned the physician, the injury would not have occurred. The allegation that is referenced in the complaint, and I recognize this allegation is very similar to the allegations that were in the complaints in Bell and Fullington, is an allegation that the physician relied upon information published in the package inserts or the physician desk reference disseminated by the, by the brand company. The difference between this case and Bell and Fullington, I would suggest, Your Honor, is that Bell and Fullington didn't take this drug until 2008. So in both those cases, it was reasonable for the court to understand that allegation to mean that the doctor relied on the post-2004 brand label. By contrast, Mrs. Brinkley was first prescribed metoclopramide in 2002. And if you take that fact and the repeated allegations in the complaint, like the one I just read in response to Judge Smith's question, which, for reference, was paragraph 34 of the amended complaint, it seems clear that what Plaintiff was saying, in the complaint, was that Plaintiff's doctor relied on the pre-2004 brand warning. And that warning obviously did not have the 2004, the pre-2004 label. And that label clearly did not have the warning against long-term use. The fact that what the doctor had relied on in initially prescribing the drug was information in the physician's desk reference or the brand label. Does not answer the question, the causation question, about whether the failure to warn, the failure to provide the information, accurate, updated information to the doctor, would have prevented Mrs. Brinkley's injury. And that's- Assuming that distinction's a good one, how do you distinguish both mensing and Bartlett? That essentially you're saying that the generic manufacturers really can rely on the brand manufacturers' warnings or lack thereof. Well, no, your honor, that's not what mensing says. What mensing says is, mensing says that it is impossible under federal law for a generic drug company to provide a stronger warning than the brand warning. And that therefore, a state law obligation to provide a stronger warning than the brand warning is preempted. But that's not this case, because in this case, plaintiffs are alleging, and that may have been the case, this case pre-mensing, but the plaintiffs are alleging here that the tort was the failure to provide a warning that the generic drug company could have provided without any FDA action. Because once the FDA approved the stronger warning against long-term use in July 2004, for the brand label, it automatically empowered the generic drug company to make the same change to its own label through the changes being effected process, and that's what mensing and Bartlett say is the central issue, is whether the private party could independently do under federal law what state law requires of it. So I think that's the answer. Bartlett is a trickier question, your honor, and that Bartlett speaks only, I think, to the separate design defect issue we've raised on appeal. It's clear in Bartlett that the court spent a lot of time focusing on the risk utility test that was used in New Hampshire. Missouri does not use the risk utility test. Indeed, Missouri doesn't really use a test for design defect at all. It invites the jury to rely on its own knowledge and experience in crafting the standard. In both Bell and Fullington, this court said that that distinction was sufficient at least to require the district court in the first instance to consider the question whether that distinction made a difference. Well, the question I have is whether the landscape has changed since Bell and Fuller came. Well, Bell was pre-Bartlett and Fullerton was after. But now we have a series of other circuits, including one, that opponents rely on particularly, I don't know how you pronounce it, Drager or Drager from the Fourth Circuit. I call that the gross case, your honor, because that was the plaintiff's name before she passed away and Drager was the administrator of the estate. Well, anyway, that case, why has the landscape not changed to where we should rule on that? One way to look at it is we ought to follow our precedent and just send it back to the district court and let them sort it out. And your honor, I think that's the course I would recommend here. Again, Drager involved, I believe, Maryland law, if I'm remembering correctly. Maryland law applied a consumer expectation test. The court said, well, we find that whether it's the consumer expectation test or the risk utility test doesn't matter. Maybe that would be relevant if we were considering Bell or Fullington again under Arkansas law. Because this court recognized that Arkansas employed the consumer expectation test as well. Missouri's test is different, unique as far as I know, in that they conspicuously avoid setting standards for the jury and invite the jury to rely on its own expertise and knowledge about what is or is not an unreasonably dangerous product. I can't tell you as I sit here today whether that will make a difference in the analysis, but I think that question remains open and the message that this court delivered in both Bell and Fullington was that where the district court never even considered the question. And it's clear here that this district court didn't. In fact, the language that the court used was I fail to see how these allegations differ from those in Mensing. It's readily apparent the plaintiff is simply trying to backdoor claims against PLEVA that the Supreme Court has found to be preempted. Now that's, I think, a substantial mischaracterization of the plaintiff's allegations. But in any event, it's clear that the court treated all of plaintiff's allegations as failure to warn claims as in Mensing. So it has not done an initial analysis of either the implied warranty or the design defect claim. And I think the appropriate course in light of this court's precedent would be to send it back. But I'd like to return our focus to the failure to provide the 2004 warning. Because I really think that's the central issue in this case. Councilman, in paragraph 22 of the complaint, when the allegation states upon information and belief the physicians who prescribed Reglan to plaintiff on a long term basis. Uses the term from 2002, February 2002 through April. Relied upon information published in the package inserts or physician's desk reference, and note that's the PDR. And then, or otherwise disseminated by reference listed drug company. What does that phrase include? What would be included in that otherwise disseminated information? Well, I think that I was not counsel in the district court, so I don't want to tell you what was necessarily in counsel's head when he wrote this paragraph. But typically, there are a number of ways in which brand companies distribute information. Could that have included the 2004 label change? Well, your honor, if the only thing you had were that paragraph, it might. But I think when you read that paragraph with the other paragraphs that we cited in our reply brief, which clearly say that nobody told the medical community about the 2004 label change. It's pretty clear that plaintiff was saying that they did not. And I think it's important in this context to remember that we're up here on a motion to dismiss. And a motion to dismiss should only be granted if there are no set of facts consistent with the complaint that would entitle the plaintiff to relief. If I am correct, as I believe I am, that no one told Mrs. Brinkley's doctor after July 2004 about the July 2004 label change. Not PLEVA, not the brand company, not anyone. And if, in fact, that would have made a difference. I believe those facts are entirely consistent with every allegation in the complaint. And in our view, they would entitle plaintiff to relief because they would state a claim for failure to warn under Missouri law that is not preempted under federal law. Not under Mensing, not under Buckman for the reasons we've set forth in our brief. And that that would be sufficient to allow the case to go forward. Obviously, your honor, if defendants can establish that indeed the doctor was aware of the 2004 label change, even if he was aware from another source, that would undermine our claim. Because at that point, there would be a learned intermediary problem and a break in the causal chain. But the fact that we've included paragraph 22 doesn't get them there. All it does is make clear that in the normal course, the way in which doctors get information is through the physician's desk reference, through package, through product samples that are provided by detail reps from brand companies. And I think it's important to note here, your honor, that while the physician's go to for this information, for information on the labels of drugs, the Reglan label was not published in the PDR after 2002. So that the brand company that was making Reglan specifically decided not to put out, to publish the new 2004 label in a way that would make it readily acceptable to most doctors. I'd like to reserve the remainder of my time, your honor. We may, thank you. Good morning, Mr. Chomsky. Good morning, your honor. May it please the court. Mike Chomsky for Defendant Appley, Pleva, Inc. This court's decisions in Bell and Fullington control the disposition of this appeal. Both of those cases rejected claims based on Pleva's alleged failure to incorporate the 2004 labeling change into the amended product label. Because the amended complaints in both of those cases specifically alleged that plaintiff's prescribing physicians relied on the brand manufacturer's package insert. And therefore got the 2004 updated warning, irrespective of what Pleva did or did not do. Is it undisputed in this case that Brinkley's doctor prescribed the brand name? That's my understanding, your honor, and that's exactly what the complaint alleges. But the key point here, your honor, is that represented by the very same lawyers that represented Bell and Fullington. Ms. Brinkley's amended complaint includes the precise language that Bell and Fullington found dispositive. In paragraph 22 of the amended complaint at JA 21 to 22, Ms. Brinkley averts that, quote, the physicians who prescribed Reglan metoclopramide to plaintiff on a long term basis. And then it specifies, from February 2002 through April 2007, relied upon information published in the package inserts by the brand manufacturer. And as Bell and Fullington recognize, that renders Pleva's alleged failure to include the 2004 labeling change in its package insert irrelevant, since plaintiff's doctor got that warning anyway. Now Mr. Bograd makes two arguments as to why Bell and Fullington are distinguishable from this case. The first thing, we heard for the first time this morning in court. He said that the difference between Bell and Fullington, even though the allegations in the complaint are exactly the same, is that the physician in those cases only prescribed the product from 2008 onward. Which made it reasonable for Mr. Bograd to maintain that what paragraph 22 really meant was that the 2002 warnings were relied upon by this physician. There's a very simple response to that, your honors. Two responses, really. First is, neither Bell or Fullington turned in any way on the years during which plaintiff's physician prescribed that product to Bell or to Fullington. But second, if you actually look at the language that I just quoted you from paragraph 22, you can see why it's inconsistent with what Mr. Bograd has just argued in court this morning. The key words again in this allegation of the complaint are that the physician who prescribed Reglan metoclopramide relied on information published in the package inserts, plural, package inserts. Not the package insert that was published in 2002, but the inserts which changed over time in 2002 and 2003 and 2004. And so it specifically references multiple versions of the brand manufacturer's labeling. The second thing about this paragraph, which again verbatim appears in the Fullington and in the Bell complaints, is that it says that the doctor relied on those inserts from February 2002 through April 2007. In other words, inclusive of all versions of the label that were put out there. And I'd respectfully submit, your honors, that there is no basis for reaching a different result in this case today than you reached in Bell and in Fullington. In fact, the amended complaint in this case was the template for the complaints that were addressed in Bell and Fullington. Again, drafted by the same lawyers, this amended complaint was October of 2011. The Bell complaint followed it by less than six weeks, and the Fullington complaint came just a few weeks later. And so it's not surprising that the language is exactly the same. And if you want to look, it's paragraph 3.11 in the Bell complaint and paragraph 5.04 in Fullington. It's not a surprise, lawyers recycle their work product. And so this was the template for the two complaints that this court addressed in Fullington and Bell. But I also want to make clear that including this language in paragraph 22, it wasn't an accident, right? Ms. Brinkley wasn't just suing PLEVA. She was also suing the brand manufacturers, Wyeth and Schwartz and Pfizer. And in order for her to be able to try to attach liability to the innovator company, to the brand manufacturer, she had to rely. She had to allege that the physician relied on the brand manufacturer's warnings. Because if she didn't allege that the brand manufacturer's warnings were relied upon, then she couldn't have made out any claim against the brand manufacturers. And so I'd respectfully submit that paragraph 22 isn't an accident. It's not an inadvertent allegation. Again, it was a deliberate litigation tactic which was included in the complaint solely for the purpose of attempting to attach liability to the brand manufacturers. And as Bell and Fullington recognized, that tactical decision by the plaintiffs in those two cases, and again by Ms. Brinkley here, has important consequences because it severs the causal chain between PLEVA's alleged failure to provide the 2004 warning and any injury that Ms. Brinkley suffered as a result of that. Now, Mr. Bograd made a second attempt at distinguishing Bell and Fullington from this case. He acknowledges that the language in paragraph 22 is very similar, in fact it's identical, but he says similar to the language that was in the Bell and Fullington complaints. But, he says, there are a series of other allegations in this complaint that don't appear in the Bell and Fullington complaints. And when you look at paragraph 22 in the context of these other allegations that allegedly aren't in Bell and Fullington, it makes clear, he argues, that paragraph 22 doesn't really mean what it says. Your honors, I have two responses to that. First, if you look carefully at the Fullington complaint, and Fullington in particular, every single paragraph that Mr. Bograd calls out at pages 9 through 11 of his gray brief has an equivalent paragraph in the Fullington complaint. And if you want, I can give you the specific match-up paragraph numbers to Fullington, but I know from reading the Fullington opinion and the Bell opinion that those complaints were very carefully studied by Chief Judge Riley, in your opinion, in the Bell case. And Judge Smith, you were on the Fullington panel. And so there are, in fact, companion paragraphs to the one that Mr. Bograd identifies as attempting to distinguish the Brinkley amended complaint from Bell and Fullington. But second and more important, there's no inconsistency or any tension, contrary to Mr. Bograd's representation, between the paragraphs that he calls out in, on the one hand, the Brinkley amended complaint. And on the other hand, the Bell and Fullington amended complaint. The paragraphs he identifies in this complaint as allegedly, if not in reality, different than the ones in this complaint, or rather in the Bell and Fullington complaints, are all paragraphs that talk about what Pleva did or didn't do. But as Bell and Fullington recognize, what Pleva did or didn't do is irrelevant if, as paragraph 22 here, paragraph 311 in Bell, and paragraph 504 in Fullington say, the doctor got, in fact, the 2004 branded warning anyway. And so there's no tension. What warnings did Schwartz and Pleva include in 2004, 2005, six and seven, and what did they communicate and to whom did they communicate it? Sure, so your honor, we're stuck here with the amended complaint. And what the amended, because of the procedural posture of the case. The amended complaint alleges that in 2004, the brand manufacturer, which is Schwartz at the time, had an FDA approved update that changed the existing warning in the product labeling in a slight manner. What the original warning said, I'll call it the 2002 warning, is therapy in excess of 12 weeks has not been studied and cannot be recommended. And in 2004, that one sentence of the label was changed to say, therapy should not exceed 12 weeks in duration. So her claim boils down to the proposition that the difference between hasn't been studied and can't be recommended and should not exceed 12 weeks is what caused her injury. And the allegation in the complaint is that when the brand manufacturer secured FDA approval for the new warning in 2004, my client, generic manufacturer Pleva, did not include that one line of the label in its package insert. That's the folded up piece of paper that we've all seen in prescription bottles, but that doctors operate under a legal obligation to review before they prescribe a drug product. And as Bell and Fullington again recognize, it's irrelevant whether or not for causation purposes, Pleva did or didn't include that language in its package insert in 2004. Because paragraph 22, just like the companion paragraphs in Bell and Fullington, specifically allege that the prescribing physician in this case relied on the package insert provided by the brand manufacturer. And that package insert is what included the updated language. And if Ms. Brinkley's doctor got that insert anyway, there's no causation between my client's alleged failure to provide that warning in its package insert in 2004 and the injuries that Ms. Brinkley is alleging. I don't want to lose sight of the other issue in this case, although I don't think you need to reach the preemption issue. But if you do find Mr. Bograd's claim that the amended complaint in this case is meaningfully distinguishable from the amended complaints that were filed weeks later in Bell and in Fullington, I'd respectfully submit that this court should join the Fifth Circuit in holding that the Supreme Court's decision in Buckman and the federal statute Buckman relied upon, 21 USC 337A, bar the plaintiff in this case from pursuing her failure to update claim. As the amended complaint in this case makes clear, everything in this case depends on an allegation that my client, Pleva, violated the Food, Drug, and Cosmetic Act, federal law, by failing to update its label to conform to the duty of sameness. It is the obligation under the FDCA that generic and branded labeling conform to each other at all times. And you don't have to look any further than paragraphs 80 through 87 of the amended complaint to see that Ms. Brinkley's entire case hinges on an alleged violation of federal law. It says over and over again, each of those paragraphs, that Pleva violated an obligation in, quote unquote, the code of federal regulations. Couldn't that be viewed, though, as evidence of their state law claim? Your Honor, if it's viewed as evidence of the underlying state law claim in the way that negligence per se, for instance, is predicated on an antecedent violation of another statutory obligation, that is a naked attempt to enforce federal law. In other words, it makes a federal violation an actionable state violation. But what Section 21 U.S.C. 337a says is that any action to enforce or restrain violations of federal law shall be brought by and in the name of the United States. And the Supreme Court's decision makes clear in Buchman that that statutory provision is an exclusive grant of enforcement authority with plenary enforcement discretion to the federal government so that we don't have state courts and state law juries adjudicating asserted violations of federal law. And that's exactly what happened in the Buchman case itself. In the Buchman case, a plaintiff brought a common law fraud claim that was drafted precisely to track the elements of common law fraud. If you look in the Supreme Court opinion at page 343 of the Buchman decision, it says plaintiffs sought damages from petitioner under state tort law. And if you look at the underlying Third Circuit decision in Buchman, it cites the restatement provisions that that common law fraud claim was drafted to copy. Counsel, why shouldn't we remand the implied warranty and design defect claims as in Bell and Fullington? Sure, Your Honor. I have a couple of answers to that. The first is to concede that this court absolutely has the discretion to remand those claims if it wants to. But as Chief Judge Riley pointed out a few minutes ago in questioning, there is a veritable litany of courts that have looked at identical warranty and design defect claims under various state laws. Now, six of your fellow courts of appeals have looked at that and found that no remand or special analysis was necessary. The Drager case in the Fourth Circuit is one. I think Henry Fossamax- How is this case any different than Bell and Fullington? Wouldn't Bell and Fullington, in essence, require us to remand? I don't think that it was error in this case or that Bell and Fullington held that it was error for the district court to not do a separate state law analysis. What this court said is we would benefit as the Eighth Circuit from hearing the district court's analysis of that. Well, let me tell you, in Bell, we sent it back partly because Bartlett hadn't been decided. But Fullerton's a different situation because Bartlett had been decided and yet that panel sent it back for deliberation. So Fullerton is the one that's most analogous to what we're doing here. Your Honor, I guess let me make a couple of observations. The first is Mr. Bograd said he can't tell you whether or not remanding the case would make any difference. And I guess I would say that before burdening a senior judge with revisiting a case that was originally filed in 2010, it would be incumbent on the party seeking a remand to provide some basis for thinking that the outcome might be different. But it wasn't any different in Bell and Fullerton. On remand, the district courts dismissed both of those complaints. And there's no reason to think it would be different here because if I could just very briefly see my red light is on, just think for just a moment about what a design defect claim is and what a breach of warranty claim is. Design defect claim targets the design of the product. Bartlett makes clear that you can't change the design of the product. And in a state that has adopted comment K like Missouri, where in order to prove a design defect in the pharmaceutical context, you have to prove the absence of an adequate warning. The claim necessarily targets either the warnings or the design of the product. And so Mensing and Bartlett are controlling whatever the niceties of Missouri law are on this point. Same thing goes with the warranty claims. If it's breach of express warranty, you're talking about the language that was used in the labeling. But as Mensing and Bartlett make clear, my client wasn't at liberty to alter the language that was used. And if you're going to not alter the language, right, not change the order, you've got to change the design to conform it. It's preempted. Thank you. Thank you very much for your indulgence. I appreciate it, your honors. Mr. Bogren. Thank you, your honor. A few quick points. First, I wanted to respond to Judge Kelly. Your honor, I'm not frankly sure whether in this case, I don't remember whether the prescription was written with the word Reglan on it or the word metaclopramide on it, but it doesn't matter because typically in every state now, the prescription form either has a box that says do not substitute or has a box that permits substitution of generic product. So the doctor clearly understands that when he's prescribing that the product, that the prescription may be filled with the generic product. That doesn't really speak to the question of what he, what information he did or did not have available to him. I'd like to go back though to the paragraph 22 issue for a moment. I'm not, I don't disagree with my opponent, Mr. Chomsky, that there is similar language in the Bell and Fullington complaints. There's a factual difference, as I noted, because in this case, the initial prescriptions were written before the 2004 warning change was made. But it may well be that Bell and Fullington should not have reached the result they reached. The allegations that we included in the amended complaint here explicitly allege that nobody informed the medical community, nobody informed Mrs. Brinkley's doctor, nobody informed Mrs. Brinkley about the 2004 label change. Under this court's precedent in the Ritchie case that we cite in our brief, and under rule 12 analysis, if there is a set of facts consistent with the allegations in the complaint that entitles a plaintiff to relief, dismissal should not be granted. And it is entirely consistent with the factual allegations in this complaint that the doctor writing prescriptions for Mrs. Brinkley to receive Medi-Qlo Pramide never was informed of the 2004 warning, not by Plato and not by the brand company. I don't remember you have any allegation that the doctor was relying in any respect on Plevue. We don't, Your Honor. And that's, but that's, again, I think that's, that's a, I assume my time's about to expire here. No, go ahead. How do you get causation on that? Well, Your Honor, I mean, they can't be responsible for what the other manufacturer said or didn't say. No, no, but the, but they are responsible for what they didn't say. That's what a failure to warn claim is, Your Honor. Yeah, but the doctor didn't rely on what they said or didn't say. I mean, you didn't allege that. Because they never communicated with him, Your Honor. If, if the, the notion of a failure to warn claim is that the defendant failed to provide a necessary warning to the plaintiff or in the case of a prescription drug to the doctor, and that that failure led to the, the injury, it would be Plevue's burden to prove that the doc, that had they published the warning, had they added it to their label, had they sent your doctor letters, the doctor would nevertheless not have read them. They could, they could attempt to break the chain of causation that way. But the, but the assumption under the, I believe Missouri adopts the heating presumption, is that had a warning been made, had a warning been provided, it would have been heated by the doctor. And under that presumption, the failure to provide that warning in the first place becomes causative of the injury, where the injury was caused by a prescription that was written in the absence of that knowledge. Okay. Thank you, Your Honor. Well, thank you. It's an interesting case. We appreciate your arguments. We thank both for the brief writing and the oral arguments. And we'll be back to you in due course. Thank you. Ms. Dolan, will you call the next case, please? Yes, Your Honor. The next case for argument this morning is Cruz et al. versus Monarch Fire Protection District et al. Well, good morning. Good morning, Your Honor. Jacobson? Yes, Your Honor. I represent three permanent employees of the Monarch Fire District who were terminated without being provided with the pre-termination hearings that were required by Monarch's longstanding rules, rules that have been in place for at least 45 years at that point in time. I call them permanent employees. Could you raise your mic up there a little bit? There's a